## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | |
| | § | **Criminal No. 4:16-CR-234** |
| **GWENDOLYN ARNETTA GIBBS,** | § | |
| **A.K.A. GWENDOLYN ARNETTA** | § | **Hon. Vanessa D. Gilmore** |
| **GUIDRY;** | § | |
| **CHARLES JOSEPH GUIDRY, JR.;** | § | |
| **and** | § | |
| **JUSTINA OBUMNADOR UZOWULU** | § | |
| | § | |
| **Defendants.** | § | |

### UNITED STATES' SECOND OPPOSED OMNIBUS MOTION *IN LIMINE*

The United States respectfully moves the Court to address the following evidentiary issues pretrial or order that Defendants and their counsel are precluded from mentioning, eliciting from any witness, or attempting to elicit from any witness, information relating to the following topics in the presence of the jury without first obtaining permission from the Court:

I.     **Motion in Limine 1- The Court Should Permit the Government to Introduce the Undercover Recorded Statements of Defendant Charles Guidry, GEX 1000, as Self-Authenticating Under Rule 902 (11), (13), and (14)**

    A.   **Brief Proffer of Facts Supporting the Authentication of GEX 1000**

1. In 2017, Major William Marlowe, Deputy Chief of Investigations at the Office of Attorney General, previously a Task Force Officer with the FBI, provided an undercover source, Ray Garcia with an FBI recording device.

2. Major Marlowe will testify that Mr. Garcia was in regular contact with targets of a healthcare fraud investigations. Major Marlowe provided Ray Garcia with an FBI

1

recording device. Major Marlow will describe this FBI recording device as a gold box with only an "ON" and "OFF" switch. Mr. Garcia could not access this FBI recording device. Access to any session saved on the device requires FBI-owned propriety software.

3. On March 3, 2017, Mr. Garcia recorded a conversation with Mr. Guidry. Major Marlowe retrieved the recording device from Mr. Garcia. Major Marlowe transferred the recording device to FBI's Electronic Surveillance (ELSUR) Unit as 1D17, Case No. 209A-HO-2096314, now GEX 1000.

4. On November 13, 2020, Mr. Garcia passed away.

5. In August 2021, the investigative team mailed a copy of GEX 1000 to Supervisory Special Agent Waikee Auyeung. SSA Auyeung reviewed the meta data underlying GEX 1000 and determined the recording had not been altered, modified or any portion deleted. GEX 1000's "hash value" matched the "hash value" of the recording when it was originally transferred from the FBI recording device to FBI custody.

6. In the attached 901(11) and 902(14) certification affidavit, SSA Auyeung explains this FBI recording device contains proprietary software that prevents anyone but the FBI from accessing the data from the device.

7. SSA Auyeung explained that during transfer of the recording to FBI custody, a cryptographic hash value is generated utilizing an algorithm which is represented by a sequence of characters generated for each transferred file based on the digital contacts of a drive, medium or file. A text file with this hash value is generated for each session on the recording device and can be used to verify the authenticity of the recordings by determining whether they have altered, manipulated, or deleted.

2

8. SSA Auyeung reviewed a copy of GEX 1000 and determined that the hash value for the copy matched the original hash value contained within the text file that was created at the time of the initial transfer of the recording to FBI custody.

9. On September 8, 2021, the United States provided notice to defense counsel of its intent to introduce GEX 1000 via Certification as Records of Regularly Conducted Activity, signed by SSA Auyeung.

**B. Legal Argument**

Federal Rule 902 provides that certain items of evidence are self-authenticating and require no extrinsic evidence of authenticity to be admitted by the court. Rule 902(13) deems admissible "a record generated by an electronic process or system that produces an accurate result" as certified by a qualified person. Rule 902(14) provides for the admissibility of data "copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements" and notice requirements of Rule 902 (11). In 2017, when Rule 902 was amended to include subsection 14, the Advisory Committee clarified in a note that "[t]oday, data copied from electronic devices, storage media, and electronic files are ordinarily authenticated by 'hash value'". The note specifically approves of using hash value comparison for an original and copy to determine if an electronic file is authentic. "This amendment allows self-authentication by a certification of a qualified person that she checked the hash value of the proffered item and that it was identical to the original."

In discussing Rule 902(14), a district court in Michigan emphasized that "the ease in which digital information can be authenticated relative to non-electronic evidence makes live witness testimony unnecessary for authentication purposes." *United States v. Anderson*, 2021

WL 4427251, at *3 (E.D. Mich. Sept. 27, 2021). The Court noted that "[d]efendant's doubts about the authentication process can also be addressed by other evidentiary rules, like presenting counter-expert witness testimony that challenges the qualified person's certification." *Id.*

The FBI recording device given to Mr. Garcia contained only an "ON" and "OFF" switch and could not be accessed in any way without FBI's propriety software. At the time of transfer of the recording to FBI custody, the unique, original hash value was created. SSA Auyeung confirmed that the hash value of GEX 1000 is identical to the original hash value of the recording. Given the certification by SSA Auyeung (attached as EX. A), the United States requests the Court allow admission of GEX 1000 as self-authenticating.

## II.   Motion in Limine 2- The Court Should Permit the Government to Include 404B Evidence Regarding Defendant Justina Uzowulu, Checks from other Healthcare Entities

On December 21, 2016, the United States filed Notice of Intent to Use 404(B) Evidence at trial. Dkt. 63. Pursuant to this notice, the United States requests an order allowing it to offer checks and a summary chart showing payments to Defendant Justina Uzowulu from Partial Hospitalization Programs (PHP) and other healthcare entities in the Houston area (attached as EX B- GEX 1203).

Count 6 of the Second Superseding Indictment alleges that from 2006 until 2016 Justina Uzowulu conspired with Gwendolyn Gibbs and Charles Guidry to pay and receive illegal health care kickbacks. Justina Uzowulu is a group home owner and sent her clients to Gibbs' and Guidry's Partial Hospitalization Program (PHP), Daybreak Rehabilitation Center (Daybreak). From October 2, 2008 to January 2012, Uzowulu received $4,100 in checks from Daybreak and Daybreak Associated Entities (attached as EX. B, GEX 1202). From February 2012 to August

4

2012, Uzowulu received $18,320 in payments from Atrium Medical Center (Atrium), a PHP in Houston (see attached EX C, GEX 1203). From August 20212 to March 2013, Uzowulu received $14,820 from Pristine Healthcare Services, a PHP in Houston (see attached EX C, GEX 1203).

On June 16, 2016, in her custodial interview, Uzowulu admitted to sending her patients to Daybreak and other PHPs and getting paid, but claimed these payments were for "transportation" of her clients. The pattern and amount of payments for "transportation" makes it less likely that Uzowulu was just receiving gas money, but rather moving her clients from PHP to PHP and seeking kickbacks from the highest bidder. From 2009 until 2012, Uzowulu also received payments from Olive Health Care Services, Inc., First Option EMS, and Empathy EMS. Search Warrant evidence from Daybreak's ambulance logs and other internal records indicate that Uzowulu's clients were transported by First Option EMS to Daybreak (GEX 631 and GEX 642). The Daybreak payments and the 404B payments were all located in Uzowulu's Account ending 7287 at Memorial Credit Union.

Extrinsic evidence under Rule 404(b) is admissible when relevant to an issue other than a defendant's character, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(1) & (2). Uzowulu's conduct is so closely blended with the Daybreak kickbacks as to constitute part of the plan or system of criminal action in this case. The payments also show a lack of mistake and are highly probative of Uzowulu's clear intent to receive kickbacks for her clients. The payments are all close in time.

Relevant extrinsic evidence is admissible unless the prejudicial effect substantially outweighs its probative value. *United States v. Kinchen*, 729 F.3d 466, 473 (5th Cir. 2013). The probative value of these other kickbacks is "enhanced by the close similarity between the

charged and extrinsic offenses." *United States v. McMahon*, 592 F.2d 871, 875 (5th Cir. 1979). That similarity is highly probative here because the extrinsic offense is the same as the charged offense. See *United States v. Beechum*, 582 F.2d 898, 913, (5th Cir. 1978) (if the elements of the two offenses match, the extrinsic offense may have greater probative value). Uzowulu's receipt of transportation payments from two other PHP companies in close proximity to the timeframe of the Daybreak kickbacks emphasizes the similarity of these acts.

Finally, any prejudicial effect is minimal. In her custodial interview at the time of arrest for the Daybreak indictment, Uzowulu links the payments from Atrium to Daybreak. Uzowulu claims the Atrium payments were "for transportation" and that any payment from Daybreak is the same. Thus, the jury will already be aware of them and may be confused if the United States does not present the Atrium checks from the same bank account on the exhibit list (GEX 951).

## III.    Motion in Limine 3- The Court Should Exclude Any Reference to Any Other Civil Lawsuit or Administrative Proceedings of Any Witness, including Johnell Fernandez

Neither the prior lawsuits nor administrative proceedings are probative of a witness's truthfulness or lack thereof.  See Federal Rule of Evidence 608(b).

Specifically, as to potential witness Johnell Fernandez, the United States requests that the Court address potential attempts by Defendants to reference administrative law cases styled, State Office of Administrative Hearings Docket Nos. 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 ADS and 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 ADS; Endless Opportunities, Inc., d/b/a B&B Healthcare Services (B&B) vs. Texas Health and Human Services Commission (HHSC). Potential witness Johnell Fernandez was the authorized representative and administrator of B&B.  HHSC brought two cases against B&B alleging several licensure standard violations including incomplete and inaccurate

clinical records and plans of care; failure to implement assessments/make services available; and missing policies, procedures, and operative documents. On December 6, 2019, Administrative Law Judge issued a Final Order assessing administrative penalties of $7,850 against and the revocation of B&B.

This Court is authorized, under Federal Rules of Evidence 401, 402 and 403, to rule, *in limine,* that reference relating to such litigation should be excluded because it is irrelevant, and its probative value is substantially outweighed by considerations of prejudice and confusion. Fed. R. Evid. 403.

A significant portion of evidence related to other actions is inadmissible hearsay, including complaints, other pleadings, judgments, and final orders. In fact, complaints and other pleadings from different cases are classic hearsay, and the pleadings from other cases do not fall within any exception. See *Boston Beverage Corp. v. Turner*, 81 B.R. 738, 747 (D. Mass. 1987) (pleadings from other cases "[i]f introduced to demonstrate the truth of the allegations contained therein . . . would clearly have been hearsay"); cf. *Yancey v. United States*, 77 F. Supp. 600, 601 (S.D.N.Y. 1948) (crewmembers' written complaints to ship's captain are hearsay and "constitute no proof of the contents contained therein").

Moreover, the probative value does not substantially outweigh the prejudicial effect of unfair prejudice. Fed. R. Evid. 403. "The decision whether to admit testimony or other evidence is committed to the sound discretion of the trial judge." *United States v. Virgen-Moreno*, 265 F.3d 276, 295 (5th Cir. 2001). Trial judges may impose reasonable limits on the presentation of evidence "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *United States v. Maloof*, 205 F.3d 819, 828

(5th Cir. 2000) (upholding court's limitation of testimony based on perceived danger of unfair prejudicial effects upon the jury by the introduction of irrelevant and scandalous information). Further, "irrelevant evidence is not admissible" under Fed. R. Evid. 402. "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action.  Fed. R. Evid. 401.

In the case at hand, Ms. Fernandez's testimony is anticipated to be limited to her personal observations during her time as a Licensed Masters Social Worker (LMSW) at Daybreak Rehabilitation Center. Ms. Fernandez's currently holds an active license in the State of Texas as an LMSW and has had that license since 1998.  Other witnesses will testify as to Medicare and Medicaid's rules and regulations relevant to Daybreak. Ms. Fernandez's administrative history with Medicaid **three years after** leaving Daybreak has little probation value to present case and could prejudice her to the jurors.

## IV.   Motion in Limine 4- The Court Should Exclude Any Reference to Certain Witnesses' Prior Convictions and Arrests.

a.   Witness Ronald Turner: 1999 conviction for Unauthorized Use of a Vehicle; 2 years confinement.  The probative value of this 22-year-old conviction does not substantially outweigh the prejudicial effect and therefore would not be admissible under Fed. R. Evid. 609.

b.   Witness Danetta Simonton: 1994 Deferred Adjudication for Unlawful Use of Human Services Funds.  The probative value of this 27-year-old "deferred adjudication" does not substantially outweigh the prejudicial effect and it is not a conviction. Therefore, it would not be admissible under Fed. R. Evid. 609.

c. Witness Euate Clay: 2008 conviction for Burglary of a Habitation; Deferred Prosecution, 5 Years, Community Supervision Expired on October 5, 2010. The probative value of this 13-year-old conviction does not substantially outweigh the prejudicial effect and therefore would not be admissible under Fed. R. Evid. 609.

d. Witness Linda Gordon: 1996 deferred disposition for Unlawful Use of Human Services Funds; Community Supervision Expired on November 2, 2006.  The probative value of this 25-year-old deferred disposition does not substantially outweigh the prejudicial effect and it is not a conviction. Therefore, it would not be admissible under Fed. R. Evid. 609.

e. Witness Shawn Manney: 1979 arrest for Robbery; Disposition is unknown. The probative value of this 42-year-old arrest does not substantially outweigh the prejudicial effect and the disposition is unknown. Therefore, it would not be admissible under Fed. R. Evid. 609.

f. Witness Shawn Manney: 1985 arrest for Assault Disposition is unknown.  The probative value of this 36-year-old arrest does not substantially outweigh the prejudicial effect and the disposition is unknown. Therefore, it would not be admissible under Fed. R. Evid. 609.

g. Witness Shawn Manney: 2002 conviction for Tampering/Fabricating Physical Evidence; Convicted of Lesser charge, Attempt to Commit, and 120 days confinement. The probative value of this 19-year-old conviction does not substantially outweigh the prejudicial effect and therefore would not be admissible under Fed. R. Evid. 609.

9

The aforementioned evidence is clearly not relevant and is remote in time, as more than 10 years have elapsed since the date of conviction in each case. Fed. R. Evid. 609. The probative value does not substantially outweigh the prejudicial effect of the criminal convictions. Fed. R. Evid. 403. In other cases, the disposition is unclear or is not a conviction.

**V.**     **Motion in Limine 5- The Court Should Exclude Any Reference to Evidence, Statements, or Arguments Intended to Shift Blame to Medicare or Other Health Care Benefit Programs, Who Are the Victims of the Fraud.**

Any evidence or argument that Medicare or other health care benefit programs failed to take adequate precautions to insulate themselves from fraud, waste, and abuse is not admissible. The negligence of a victim in failing to discover a fraudulent scheme is not a defense to a defendant's criminal misconduct. *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal conduct."). Therefore, Defendants should not be permitted to argue that the failure or inability to discover the crime by Medicare or other health care benefit programs is an excuse for their own conduct and should be precluded from doing so through argument or cross-examination—or any other means—at trial.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court grant the above motions in limine.

Respectfully submitted,

JENNIFER B. LOWRY
Acting United States Attorney

By:     /s/ Kathryn Olson
Kathryn Olson
Special Assistant United States Attorney
1000 Louisiana Street, Suite 2300
Houston, TX 77002
Phone: (713) 567-9146
E-mail: Kathryn.Olson@usdoj.gov

Michael Day
Assistant United States Attorney

Cynthia A. Villanueva
Assistant United States Attorney

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with counsel for Defendants in an effort to resolve the issues raised in the motion.  Counsel for Defendants Uzowulu and Guidry oppose this motion. I did not hear from Counsel for Defendant Gibbs by the time of filing.

/s/ Kathryn Olson
Kathryn Olson

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed and served this document on defense counsel of record using CM/ECF on November 26, 2021.

<u>/s/ *Kathryn Olson*        </u>
Kathryn Olson

# Exhibit A

**Rule 902 (11), (13), and (14) Certification**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 16-CR-234 |
| Plaintiff, | |
| v. | CERTIFICATION IN SUPPORT OF AUTHENTICITY OF BUSINESS RECORDS AND OTHER EVIDENCE |
| Gwendolyn Gibbs, Charles Guidry, and Justina Uzowulu, | |
| Defendant. | |

Waikee Auyeung, being duly sworn, based on information and belief, deposes and states:

1.     I am a Supervisory Special Agent (SSA) with the Federal Bureau of Investigation (FBI), currently serving within the Audio Surveillance Unit (ASU), Operational Technology Division (OTD) in Quantico, Virginia.  The ASU is responsible for the development, acquisition, and deployment of audio surveillance capabilities to FBI field offices in support of their investigative responsibilities.  I have received continued education and training on the use of the technology deployed in this case.  I hold a Bachelor of Science in Pharmacy from St. John University and was a licensed pharmacist in the State of New York.

2.     I am filing this certification to satisfy Federal Rules of Evidence 902(11)[1] and 902(14).

3.     The audio surveillance device(s) used in the case for which I am providing this certification uses a process of digital identification to authenticate the recordings.  The recordings are saved as data stored in 1,048 byte blocks which are a sequence of bytes and bits and are time and date stamped.  All data in a block are protected utilizing a Cyclic Redundancy Check (CRC) which is an error detecting code widely used within the computer industry to protects the data integrity.  The data consists of several files which makes up a session when the device is turned "ON" and

---

[1] "The reference to the 'certification requirements of Rule 902(11) or (12)' is only to the procedural requirements for a valid certification.  There is no intent to require, or permit, a certification under this Rule to prove the requirements of Rule 803(6)."  Fed. R. Evid. 902(14) Advisory Committee's note to 2017 amendment.

"OFF".  Additional sessions could also be created if the file becomes too large (approximately a CD size data) and the end time of these sessions should match the begin time of the subsequent sessions.  The software will notate a symbol with the session to notify that the recording was split due to the size.  It should also be noted that the first session will always be smaller in size.

4.      After recording, the sessions are transferred to removable media utilizing proprietary software to "write once" CDs, DVDs or Blu-Ray media.  A proprietary software is used to prevent anyone from accessing the data from the device (the file system cannot be browsed by Windows OS) without it.  During the transfer, a cryptographic hash value is generated utilizing the SHA256 algorithm which is represented by a sequence of characters generated for each transferred file based upon the digital contents of a drive, medium or file.  A text file with the SHA-256 hash values is generated for each session and can be used to verify the authenticity of the recordings by determining whether they have been altered, manipulated, or deleted. In addition, to the SHA256 hash values, the proprietary software will indicate additional information with markers (colored flags) corresponding to the session.  These flags will let the user know if the recording ended with low battery; ended with power failure; split due to size limit; split due to camera loss; split due to bad blocks; made with enabled GPS module; and whether there was an unusual data size difference detected.

5.      I have been requested to verify the authenticity of the recording made from an authorized FBI surveillance device deployed in this case.  A DVD copy of the audio recording was sent to me by the FBI Houston Field Office on or about 08/19/2021 and contained one (1) audio session recording.

6.      Upon receiving the DVD containing the working copy of the recording, I was able to verify the presence of the audio session through the proprietary software player included on the DVD.

I was also able to open the text file with the SHA-256 hash value for the recording.  I compared the SHA-256 hash value in the text file to the SHA-256 hash value generated from the downloaded file utilizing a hash calculator.  The SHA-256 hash value for the recording was an exact match, meaning the recording has not been altered, modified, or had any portion deleted. In addition, there was no markers (colored flags) associated with the session.

7.     After completing my verification, I signed and dated the disc containing the copy of the recording along with their associated hash value.  I then shipped the disc to the requesting case agent.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED: September 2, 2021.

Waikee Auyeung
Supervisory Special Agent, FBI

# Exhibit B

## Checks to Justina Uzowulu from

## Daybreak Related Entities

| | Checks to Justina Uzowulu from Daybreak Related Entities | | | | | |
|---|---|---|---|---|---|---|
| ACCT# | ACCT NAME | DATE | CK # | PAID TO | AMT PD | MEMO |
| 8286 | Daybreak Home Health Nursing Services | 10/2/2008 | 1728 | Uzowulu, Justina | $600.00 | |
| 1767 | Starr L. Owens | 3/2/2010 | 8362615 | Justina Uzowulu | $900.00 | |
| 0457 | Daybreak Rehab Center | 2/25/2011 | 1014 | Uzowulu, Justina | $450.00 | |
| 0457 | Daybreak Rehab Center | 9/27/2011 | 1400 | Uzowulu, Justina | $800.00 | transportation |
| 0457 | Daybreak Rehab Center | 11/18/2011 | 1574 | Uzowulu, Justina | $450.00 | driver & p transport |
| 0457 | Daybreak Rehab Center | 11/18/2011 | 1575 | Uzowulu, Justina | $450.00 | |
| 1201 | Daybreak Rehab Center | 1/23/2012 | 284 | Uzowulu, Justina | $450.00 | Justin K driver |

**TOTAL**      **$4,100.00**

# Exhibit C

## Checks to Justina Uzowulu from

## Other Healthcare Entities

## Checks to Justina Uzowulu From Other Healthcare Entities

| DATE | CHECK # | FROM | AMOUNT | MEMO |
|---|---|---|---|---|
| 2/6/2012 | 3176 | Atrium Medical Center | $200.00 | |
| 2/27/2012 | 3314 | Atrium Medical Center | $1,800.00 | transportation |
| 3/6/2012 | 3357 | Atrium Medical Center | $880.00 | transportation WE 3012012 |
| 3/14/2012 | 3389 | Atrium Medical Center | $900.00 | |
| 3/19/2012 | 3421 | Atrium Medical Center | $900.00 | |
| 4/2/2012 | 3470 | Atrium Medical Center | $720.00 | transporation |
| 4/2/2012 | 3508 | Atrium Medical Center | $680.00 | |
| 4/9/2012 | 3533 | Atrium Medical Center | $820.00 | |
| 4/16/2012 | 3569 | Atrium Medical Center | $740.00 | transportation |
| 4/24/2012 | 3602 | Atrium Medical Center | $700.00 | transportation |
| 5/1/2012 | 3617 | Atrium Medical Center | $680.00 | |
| 6/18/2012 | 3845 | Atrium Medical Center | $620.00 | |
| 6/18/2012 | 3806 | Atrium Medical Center | $600.00 | |
| 6/22/2012 | 3883 | Atrium Medical Center | $2,720.00 | transporation |
| 7/2/2012 | 3915 | Atrium Medical Center | $660.00 | transportation |
| 7/9/2012 | 3939 | Atrium Medical Center | $560.00 | transportation |
| 7/23/2012 | 3984 | Atrium Medical Center | $680.00 | transportation |
| 7/23/2012 | 4014 | Atrium Medical Center | $680.00 | transportation |
| 7/30/2012 | 4040 | Atrium Medical Center | $1,000.00 | transportation WE7/26/12 |
| 8/20/2012 | 4160 | Atrium Medical Center | $780.00 | WE 8/16/12 |
| 8/21/2012 | 4097 | Atrium Medical Center | $1,000.00 | 7/26/12 - 8/1/12 |
| | | | | |
| 6/30/2009 | 1185 | Empathy EMS | $750.00 | equipment |
| 7/20/2009 | 1251 | Empathy EMS | $500.00 | housekeeping |
| 7/20/2009 | 1250 | Empathy EMS | $500.00 | materials |
| 8/3/2009 | 1196 | Empathy EMS | $500.00 | |
| 8/3/2009 | 1197 | Empathy EMS | $500.00 | |
| 9/3/2009 | 1277 | Empathy EMS | $500.00 | |
| | | | | |

| DATE | CHECK # | FROM | AMOUNT | MEMO |
|---|---|---|---|---|
| 10/14/2009 | 1059 | First Option EMS | $1,000.00 | |
| 11/13/2009 | 1087 | First Option EMS | $1,000.00 | marketing exp |
| | | | | |
| 5/7/2009 | 1021 | First Precision Healthcare Services Inc. | $200.00 | |
| 5/27/2009 | 1028 | First Precision Healthcare Services Inc. | $500.00 | |
| 7/6/2009 | 1034 | First Precision Healthcare Services Inc. | $250.00 | |
| 8/17/2009 | 1046 | First Precision Healthcare Services Inc. | $500.00 | |
| 10/27/2009 | 1065 | First Precision Healthcare Services Inc. | $500.00 | |
| 11/23/2011 | 1434 | First Precision Healthcare Services Inc. | $500.00 | |
| 3/6/2012 | 1510 | First Precision Healthcare Services Inc. | $1,000.00 | |
| 6/5/2012 | 1583 | First Precision Healthcare Services Inc. | $500.00 | |
| 11/20/2012 | 1732 | First Precision Healthcare Services Inc. | $500.00 | |
| 12/11/2012 | 1760 | First Precision Healthcare Services Inc. | $500.00 | |
| 12/27/2012 | 1773 | First Precision Healthcare Services Inc. | $500.00 | |
| 1/7/2013 | 1791 | First Precision Healthcare Services Inc. | $500.00 | |
| 7/17/2013 | 2063 | First Precision Healthcare Services Inc. | $300.00 | |
| 10/7/2013 | 2211 | First Precision Healthcare Services Inc. | $900.00 | |
| 5/8/2014 | 2317 | First Precision Healthcare Services Inc. | $500.00 | |
| | | | | |
| 11/16/2011 | 1493 | Olive Health Care Services Inc. | $1,000.00 | |
| 12/5/2011 | 10650 | Olive Health Care Services Inc. | $1,000.00 | |
| 12/14/2011 | 10668 | Olive Health Care Services Inc. | $2,900.00 | |
| 1/13/2012 | 1530 | Olive Health Care Services Inc. | $100.00 | |
| 1/23/2012 | 10701 | Olive Health Care Services Inc. | $1,350.00 | |
| 2/6/2012 | 10703 | Olive Health Care Services Inc. | $1,550.00 | |
| | | | | |
| 8/29/2012 | 1068 | Pristine Healthcare | $880.00 | |
| 8/31/2012 | 1088 | Pristine Healthcare | $940.00 | |
| 9/11/2012 | 1121 | Pristine Healthcare | $900.00 | |
| 9/17/2012 | 1071 | Pristine Healthcare | $640.00 | Justina transportation |
| 9/25/2012 | 1088 | Pristine Healthcare | $420.00 | Justina transportation |
| 10/15/2012 | 1241 | Pristine Healthcare | $460.00 | Justina transportation |

| DATE | CHECK # | FROM | AMOUNT | MEMO |
|---|---|---|---|---|
| 10/15/2012 | 1216 | Pristine Healthcare | $440.00 | Justina transportation |
| 10/15/2012 | 1193 | Pristine Healthcare | $240.00 | Justina transportation |
| 10/23/2012 | 1263 | Pristine Healthcare | $560.00 | Justina transportation |
| 11/5/2012 | 1293 | Pristine Healthcare | $500.00 | Justina transportation |
| 11/7/2012 | 1311 | Pristine Healthcare | $520.00 | Justina transportation |
| 11/20/2012 | 1363 | Pristine Healthcare | $400.00 | Justina transportation |
| 11/20/2012 | 1334 | Pristine Healthcare | $480.00 | Justina transportation |
| 12/11/2012 | 1430 | Pristine Healthcare | $560.00 | Justina transportation |
| 12/19/2012 | 1432 | Pristine Healthcare | $500.00 | Justina transportation |
| 12/21/2012 | 1454 | Pristine Healthcare | $400.00 | Justina transportation |
| 1/22/2013 | 1498 | Pristine Healthcare | $300.00 | Justina transportation |
| 1/22/2013 | 1539 | Pristine Healthcare | $380.00 | Justina transportation |
| 2/5/2013 | 1558 | Pristine Healthcare | $400.00 | Justina transportation |
| 2/5/2013 | 1583 | Pristine Healthcare | $500.00 | Justina transportation |
| 2/12/2013 | 1602 | Pristine Healthcare | $720.00 | Justina transportation |
| 2/17/2013 | 1626 | Pristine Healthcare | $880.00 | Justina transportation |
| 2/17/2013 | 1639 | Pristine Healthcare | $840.00 | Justina transportation |
| 3/5/2013 | 1660 | Pristine Healthcare | $620.00 | Justina transportation |
| 3/12/2013 | 1675 | Pristine Healthcare | $560.00 | Justina transportation |
| 3/21/2013 | 1692 | Pristine Healthcare | $780.00 | |

**TOTAL**                                    **$53,940.00**